# In the United States Court of Federal Claims

No. 20-1266C
(Filed Under Seal: January 26, 2021)
(Reissued for Publication: February 18, 2021)*

| | |
|---|---|
| QUANTERION SOLUTIONS, INC., Plaintiff, v. THE UNITED STATES, Defendant, and SURVICE ENGINEERING CO., LLC, Defendant-Intervenor. | Postaward Bid Protest; Cross-Motions for Judgment on the Administrative Record; Evaluation of Proposals; Transition Plan and Costs; Cost Realism Analysis |

Bret S. Wacker, Detroit, MI, for plaintiff.

Kyle S. Beckrich, United States Department of Justice, Washington, DC, for defendant.

Donald J. Walsh, Baltimore, MD, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

In this postaward bid protest, plaintiff Quanterion Solutions, Inc. ("QSI") contends that the United States Department of the Air Force ("Agency") improperly awarded a research and development services contract to an offeror that submitted a technically unacceptable proposal. The awardee of the contract, SURVICE Engineering Co., LLC ("SURVICE"), intervenes in this suit. QSI seeks a permanent injunction of the award to SURVICE.

* The court initially issued this Opinion and Order under seal with instructions for the parties to propose any redactions. The parties informed the court that no redactions were necessary to the Opinion and Order.

Before the court are cross-motions for judgment on the administrative record filed by QSI and SURVICE pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), along with a combined RCFC 12(b)(6) motion to dismiss and RCFC 52.1 cross-motion for judgment on the administrative record filed by the United States.  For the reasons set forth below, the court denies defendant's motion to dismiss as moot, grants SURVICE's and defendant's cross-motions for judgment on the administrative record, and denies QSI's motion for judgment on the administrative record and its request for permanent injunctive relief.

## I.  BACKGROUND

### A.  History of the Procurement

#### 1.  Request for Proposal

The dispute in this case arises from Request for Proposal FA 8075-20-R-0001 ("RFP"), in which the Agency combines the work of three incumbent contracts into one successor contract.  Each of the incumbent contracts concerns research services for a particular grouping of topics of interest to the military through the operation of an Information Analysis Center ("IAC").  Administrative R. ("AR") 1169.  As explained in the RFP, the Department of Defense ("DoD") "IACs function as centers of excellence to engage in collecting, analyzing, synthesizing, and disseminating engineering, scientific and technical information (STI) in clearly defined specialized technical focus areas of significant DoD interest or concern."  Id.  The first incumbent contract is for the Defense Systems IAC ("DSIAC"), the second is for the Homeland Defense and Security IAC ("HDIAC"), and the third is for the Cyber-Security and Information Systems IAC ("CSIAC").  Id.

The contractor for an IAC maintains a Basic Center of Operations ("BCO").  Id.  Until this current procurement, each of the three incumbent BCO contracts was awarded to a small business under a six-year indefinite delivery/indefinite quantity ("ID/IQ") contract.  Id.  Through this RFP, however, the three BCOs would be consolidated under a single BCO contract, sometimes referred to as the IAC BCO ID/IQ contract or the DoD IAC BCO contract.  Id. at 1274, 1279.  SURVICE is the incumbent contractor for the DSIAC BCO and QSI is the incumbent contractor for the HDIAC and CSIAC BCOs.  Id. at 3344.

The Agency issued the RFP on November 12, 2019.  Id. at 545-1127.  The contracting vehicle is an "Indefinite Delivery, Indefinite Quantity Cost Plus Fixed Fee . . . , Cost Reimbursable, and Firm Fixed Price . . . six (6) year single award contract, with an estimated ceiling value of $99.1" million.  Id. at 1272.  Of particular interest to this protest are the first four Contract Line Item Numbers, CLINs 0001 through 0004.  CLIN 0001 pays for the transition from the incumbent DSIAC contract, CLIN 0002 pays for the transition from the incumbent HDIAC contract, CLIN 0003 pays for the transition from the incumbent CSIAC contract, and CLIN 0004 pays for contract performance for the first two years, i.e., the base period, of the IAC BCO ID/IQ contract.  See id. at 562-63, 1279, 1281.  Both CLIN 0001 and CLIN 0004 were

scheduled to start on July 1, 2020. Id. at 562-63. CLIN 0002 and CLIN 0003 were scheduled to start at later dates, creating a staggered transition from the incumbent IAC contracts. Id.

The RFP was amended several times, but the text of the provisions most relevant to this protest were not significantly altered. Of more interest are several questions posed on the topic of the transition CLINs and the pricing of the first ninety days of contract performance. These questions and the Agency's answers will be discussed in the analysis section of this opinion. Offerors were to submit their proposals in four separate volumes (Volumes I-IV): Past Performance, Technical Capability, Cost/Price, and Contract Documentation. Id. at 1274. Volume I was due on December 31, 2019; the other volumes were due on January 17, 2020. Id. at 1165. SURVICE and QSI, the incumbent contractors, were the only offerors to submit proposals. Id. at 3356.

**2. Evaluation Scheme**

The Agency opted for a best-value evaluation model to select the offeror that would "best meet, or exceed, the [contract] requirements." Id. at 1251. The evaluation factors to be weighed in this decision were past performance, technical capability (with subfactors for transition, operations approach, and management approach), and cost/price. Id. The past performance and technical capability factors were of equal importance and were significantly more important than cost/price when combined. Id. at 1252.

The transition subfactor of technical capability would be rated as acceptable or unacceptable, unlike the other subfactors of technical capability where strengths, weaknesses, significant weaknesses, and deficiencies would be identified, and which would be rated on a scale from outstanding to unacceptable. Id. at 1251, 1256-57. Most of the attention in this protest is on the transition subfactor, sometimes referred to as technical capability subfactor 1.

**3. Evaluation of Proposals**

For past performance, SURVICE received a higher "substantial" confidence rating compared to QSI's "satisfactory" confidence rating. Id. at 3498-99. For the transition subfactor of technical capability, both proposals were rated "acceptable." Id. at 3501, 3504. For the other technical capability subfactors, SURVICE received a "good" rating and an "acceptable" rating, whereas QSI received two "acceptable" ratings. Id. at 3501-06. Nothing in the record of the Agency's evaluation of proposals suggests that the difference in the offerors' transition plans, or the difference in the associated transition costs proposed by the offerors, was considered to be a discriminating factor between the proposals submitted by QSI and SURVICE. See, e.g., id. at 3501-10. The Source Selection Authority ("SSA") noted that "SURVICE ha[d] a higher rated proposal at a lower cost/price than that of QSI." Id. at 3510. The SSA decided to award the IAC BCO ID/IQ contract to SURVICE without discussions. Id. at 3509-10.

### B. Protest History

On May 19, 2020, QSI received a written debriefing regarding its nonselection for award. Id. at 3564-69. The Agency also answered QSI's follow-up questions in a written statement provided on May 21, 2020. Id. at 3570-72. Subsequently, QSI filed a timely protest with the Government Accountability Office ("GAO"), which was denied on September 3, 2020.[1] Id. at 3575-5629.

QSI filed the instant protest on September 24, 2020. In its complaint, QSI asserts that the Agency's evaluation of SURVICE's transition plan was inconsistent with the terms of the RFP, and that it was prejudiced by this error. The Agency agreed to delay performance of the IAC BCO ID/IQ contract until the end of January 2021 to accommodate this litigation, and the parties, pursuant to their agreed-upon briefing schedule, have now fully briefed cross-motions for judgment on the administrative record and defendant's RCFC 12(b)(6) motion to dismiss. None of the parties requested oral argument and this matter is ripe for decision.

## II. DISCUSSION

In their briefs, the parties address QSI's contention that the Agency's evaluation of the transition plan in SURVICE's proposal was improper. This dispute largely turns on the correct interpretation of the RFP and, secondarily, if the relevant RFP provisions are ambiguous, whether the RFP contains a patent or a latent ambiguity regarding technical capability factor 1. A final concern is whether a mathematical error in a component of the Agency's Independent Government Cost Estimate ("IGCE") invalidates the Agency's award decision.

As a threshold matter, defendant raises the issue of waiver in its RCFC 12(b)(6) motion to dismiss: "Whether [QSI] has waived its challenge to the [RFP] when it proffers an interpretation of a[n] [RFP] requirement that is contrary to the clear and unambiguous terms of the [RFP]." Def.'s Mot. 1. However, the proper interpretation of the RFP terms concerning transition plans is the primary inquiry in this protest, and this issue requires a close examination of extrapleading materials in the AR provided by the Agency. Only after examining the AR can the court determine whether the RFP terms were ambiguous and if any such ambiguity was patent, requiring QSI to seek clarification prior to the proposal submission deadline.

In consequence, the optimal procedural approach is for the court to resolve the parties' motions for judgment on the administrative record, which will address the patent ambiguity issue as an integral part of the analysis. This approach renders it unnecessary for the court to resolve defendant's motion to dismiss. See Hyperion, Inc. v. United States, 120 Fed. Cl. 504, 510 (2015) (proceeding under RCFC 52.1 because "the court's consideration of these extra-pleading materials requires conversion of the government's motion to dismiss or for summary judgment into a motion for judgment on the administrative record"); cf. RCFC 12(b)(6)(d) (requiring

[1] Due to differences in the arguments considered by the GAO, that forum's analysis sheds no light on the issues before the court.

conversion of the motion to dismiss to a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court"). Therefore, the court denies defendant's motion to dismiss under RCFC 12(b)(6) because it is moot.[2]

To frame its analysis, the court turns to the standard of review to be applied in this protest.

**A. Bid Protest Review**

The court reviews challenged agency actions in a procurement pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under the arbitrary and capricious standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (2001)); accord Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). Thus, the court's review of a procuring agency's decision is "highly deferential." Advanced Data Concepts, Inc., 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency."). Furthermore, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

[2] Defendant's motion to dismiss also does not address the mathematical error in a portion of the Agency's IGCE, an issue that must be addressed before the court can determine whether dismissal of this protest is warranted. For this reason, as well, the parties' cross-motions for judgment on the administrative record are the proper focus of the court's analysis here.

with law is greater [in negotiated procurements] than in other types of bid protests." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004). In addition, technical evaluation ratings produced by the procuring agency, in particular, are entitled to deference. E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."); accord Goldschmitt & Assocs., LLC v. United States, 149 Fed. Cl. 401, 405 (2020) ("[T]his Court gives great deference to 'evaluations of proposals for their technical quality' by 'an agency's subject-matter experts.'" (quoting RX Joint Venture, LLC v. United States, 145 Fed. Cl. 207, 213 (2019))).

"[O]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations." Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) (alteration in original) (quoting Andersen Consulting Co. v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992)). To mount a successful challenge to a contract award, a protestor must identify "a significant error in the procurement process" and show "that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"). "[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." Data Gen. Corp., 78 F.3d at 1562.

**B. Analysis**

The parties' primary dispute in this protest is illustrated by the different approaches the offerors took in proposing costs of performance during transition periods. SURVICE's approach to the transition of each of the incumbent IAC contracts was to allocate to CLINs 0001-0003 only the actual costs required to prepare for contract performance as the provider of that set of services. QSI's approach was to include in CLINs 0001-0003 not only the preparation costs for the assumption of duties for each of the incumbent IAC contracts, but also its contract performance costs within the ninety-day transition period for providing that set of IAC services. As a result, SURVICE proposed a total price of $266,450 for CLINs 0001-0003, AR 2827, whereas QSI proposed a total price of $1,154,231 for these CLINs, id. at 2130. The Agency found the offerors' proposed costs, as well as the markedly different transition approaches of the offerors, to be acceptable. Further, the evaluation record contains no statement that either QSI or SURVICE correctly or incorrectly interpreted the RFP as to the allocation of costs to CLINs 0001-0003. With this illustration of the offerors' different approaches in mind, the court turns first to the relevant terms of the RFP.

**1. The RFP Does Not Require Transition CLINs to Include IAC Operational Costs**

QSI vigorously defends its interpretation of the terms of the RFP that are relevant to transition plans and transition costs. However, QSI's position is unjustified when the RFP is considered as a whole. See Banknote Corp. of Am., 365 F.3d 1353 ("[W]e must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003))). In other words, QSI's proposed interpretation of an isolated sentence cannot control if, as is the case here, all of the relevant terms of the RFP can be harmonized to provide a reasonable and coherent transition requirement. In addition, because the RFP was amended by the Agency's answers to questions from potential offerors, AR 1261-67, 1270-71, 1307, all of the RFP terms that address transition plans and costs, and the Agency's answers to questions related to transition plans and costs, must be harmonized. See, e.g., BayFirst Sols., LLC v. United States, 102 Fed. Cl. 677, 689 & n.15 (2012) (relying on answers to questions from offerors to interpret an RFP). Once all of the relevant RFP elements have been considered, QSI's interpretation of the RFP cannot stand.

Three sections of the RFP, two sections of the Performance Work Statement ("PWS"), and three Agency answers to questions are relevant to the parties' dispute. First, Section L of the RFP, providing "General Instructions and Information," AR 1272, contains the following instruction regarding the offeror's transition plan in L.4.3.1:

> The Offeror shall provide a Phase-In Transition Plan. All Offerors shall describe their approach to transition from the legacy CS[IAC], DS[IAC], and HD[IAC] contracts to full performance using 90-day phase-in periods for each legacy contract. The Offeror shall describe how it will use the phase-in period to mobilize, train, and otherwise prepare to assume complete responsibility for the BCOs. Volume III pricing of CLIN 0001, [0]002, and [0]003 shall align with the Offeror's Phase-In Transition Plan approach.

Id. at 1279. Section L also provides instruction in L5.2:

> Phase-In Transition (CLIN 0001 (DS[IAC]), CLIN 0002 (HD[IAC]), CLIN 0003 (CS[IAC])). The Offeror shall propose Cost Plus Fixed-Fee (CPFF) amounts for the efforts required in the assumption of full responsibility of the DSIAC, HDIAC, and CSIAC BCO requirements. If an Offeror proposes no need to transition from another contractor or a shorter than 90 day transition period, the Offeror shall still price out all CLINs based on their proposed cost to perform the initial 90 days of services after contract award. The Offeror's approach to providing services during the initial 90 day period shall be addressed in Technical Capability Volume II.

Id. at 1281. Turning to Section M of the RFP, "Evaluation Factors for Award," id. at 1251, the Agency's evaluation criterion for transition plans is succinctly summarized in M.3.2.2.1.1:

> The proposal provides a feasible approach to execute a sound and feasible transition for all three legacy BCOs that ensures seamless uninterrupted service delivery within 90 days from the first date of phase-in performance, starting with the day of award. The proposal provides details of the phase-in of personnel and management of phase-in efforts. The phase-in approach identifies key personnel positions in the organizational structure and their time phasing, even if they are proposing no need to transition from a different contractor or are proposing a shorter than 90 day transition period. The Phase-In Transition Plan meets the requirements in PWS paragraphs 3.1 and 3.2.

Id. at 1257. Based on these three statements, at least one transition requirement is clear—that for each incumbent IAC the transition must take no longer than ninety days.

Turning to the PWS, there is a rather lengthy description of the transition requirement. The most relevant excerpts are reproduced here. First, in PWS 3.1, "Phase-In—Introduction and Overview," the following guidance is given:

> For Phase-In, the contractor performing at the start of this contract is referred to as the "successor Contractor" and the contractors performing the BCO functions on contracts FA8075-14-D-0001 (DSIAC), FA8075-18-D-0029 (HDIAC), and FA8075-17-D-0001 (CSIAC) are referred to as the "incumbent contractors".
>
> The successor contractor shall perform phase-in/transition activities to transition to full performance of this PWS, taking over the BCO functions of the incumbent DSIAC, HDIAC, and CSIAC contractors. The period of performance for the contractor's phase-in of each legacy contract shall not exceed 90 days. The legacy BCO contracts' transition phase-in will be staggered within a year.
>
> . . . .
>
> It is anticipated that the start dates of the DSIAC BCO transition period will coincide with the award date of this contract. This 90 day transitioning period will commence upon the Government's issuance of the first transition task orders for the first legacy contract to transition. The Government reserves the right to revise the dates of transition by contract modification.
>
> Phase-In activities will be performed by the contractor in accordance with the specific requirements of subsection 3.2 below, where the BCO contractor for this contract shall perform the role of "successor contractor" and the prior DSIAC contractor for contract FA8075-14-D-0001, HDIAC contractor for contract FA8075-18-D-0029, and CSIAC contractor for contract FA8075-17-D-0001 will perform the role of "incumbent contractor" as those terms are used in this PWS. The Government will order and obligate funding for the transition-in services to

> be performed by the contractor.  The period of performance for the contractor's phase-in for each legacy contract shall not exceed 90 days.  This 90 day period will commence upon the Government's issuance of the Task Order obligating transition-in services funding.
>
> Prior to the end of each legacy BCO contract, that incumbent contractor will be required to submit a phase-out plan for Contracting Officer approval.  Their plan will include transitioning the BCO IAC subject matter experts list and other relevant resources (similar to the start of the transition-in period, the Government will also issue a Phase-Out Transition Task Order to each legacy BCO contractor that will order and obligate funding for their transition-out activities under their contract).  Each legacy BCO contractor will then work with the successor BCO contractor to synchronize the respective transition plans and activities of each.  These communications shall build upon and provide further detail on the specific transition roles and transition requirements in the BCO contract included herein and the incumbent's phase-out/transition-out plan.
>
> The contractor's approved Phase-In/Transition Plan, as stated in its proposal (or as modified based on negotiation with the Contracting Officer, if discussions are conducted before contract award) shall be made an attachment to the contract at time of award and/or will be referenced in the Task Order covering phase-in/transition.  These services will be procured under the Phase-In/Transition CLIN in the contract.  The contractor shall report on its phase-in progress in accordance with the Phase/In Transition Plan . . . .

Id. at 1198-99.  The Agency provided further guidance in PWS 3.2, titled "Phase-In—Specific Requirements":

> This section applies to the BCO contractor as "successor contractor".  All services required under this subsection will be ordered and funded through issuance of one (1) or more Phase-In Task Orders, citing this PWS subsection, the applicable contract phase-in contract line item (CLIN)(s), and incorporating the successor contractor's accepted Transition Plan as an attachment to the Phase-In Task Order(s) that will serve as the Government's requirements document for the Task Order(s).  It is anticipated that the Phase-In Task Order(s) will be issued within the first 90 days of BCO contract award.  The successor contractor shall work with each incumbent contractor on the legacy CSIAC, DSIAC, and HDIAC BCO contracts to ensure seamless transfer of the functions for the full responsibility of the BCO requirement.  Deliver weekly status reports, until the phase-in has been completed.  These reports shall provide detailed information on the transition status and highlight any problems that occur during this timeframe . . . .

> Within 90 days of contract award, the BCO contractor shall receive government provided training about evaluating, processing, and uploading STI . . . .

Id. at 1199.  Again, it is clear that the transition from each incumbent IAC contract must occur within ninety days of the contract award date or other triggering event in the staggered transition schedule, and that there will be responsibilities for both the successor contractor and the incumbent contractor during these ninety-day periods.

Putting these various RFP provisions together, the transition activities encompassed in CLINs 0001-0003 would include efforts to "mobilize, train, and otherwise prepare to assume complete responsibility for the BCOs."  Id. at 1279.  Further, an offeror's transition plan would be evaluated to determine if that plan "execute[s] a sound and feasible transition for all three legacy BCOs that ensures seamless uninterrupted service delivery within 90 days from the first date of phase-in performance, starting with the day of award."  Id. at 1257.  And the allocated costs in CLINs 0001-0003 would include "amounts for the efforts required in the assumption of full responsibility of the DSIAC, HDIAC, and CSIAC BCO requirements."  Id. at 1281.  Unfortunately for QSI's chances of success in this protest, however, there is no clear instruction in the RFP that CLINs 0001-0003 must also include an amount of nontransition-related contract performance costs during the ninety-day transition periods.

QSI relies principally on the following excerpted sentence from RFP L5.2:  "If an Offeror proposes no need to transition from another contractor or a shorter than 90 day transition period, the Offeror shall still price out all CLINs based on their proposed cost to perform the initial 90 days of services after contract award."  Id. at 1281.  According to QSI, this directive shows the "Government's intention to have all offerors, incumbents and non-incumbents, propose full 90-day Phase In periods, including costs to perform [IAC services], regardless of whether an actual transition was required . . . ."  QSI's Mot. 18.  Although such an intent is perhaps plausible, in light of these RFP terms, QSI's contention does not rise above the level of speculation.

The court finds no clear statement in Section L, Section M, or the PWS of the RFP that mandates that an offeror's transition CLINs include not only the costs of preparing to perform but also the costs of actually performing IAC services.  Indeed, the majority of the verbiage in the RFP addressing an offeror's transition plan and costs focuses instead on mobilizing and gearing up to perform, rather than performing, IAC services.

Answers to three offeror questions show that the Agency refused to firmly delineate the scope of the activities that should be allocated to CLINs 0001-0003, and instead permitted an offeror to choose its own approach to proposing costs for the transition periods.  The first question sought clarity on precisely this point:

> Q:   In paragraph L5.2, does the phrase "price out all CLINS" refer to CLINs (0001, 0002, 0003) or to CLINs (0001, 0002, 0003, and 0004)?  "If an Offeror proposes no need to transition from another contractor or a shorter than 90 day

> transition period, the Offeror shall still price out all CLINs based on their proposed cost to perform the initial 90 days of services after the contract award."
>
> A: L5.2 refers to Phase-In Transition CLINS for the efforts required in the assumption of full responsibility of the DSIAC, HDIAC, and CSIAC BCO requirements (CLIN 0001 (DS), CLIN 0002 (HD), CLIN 0003 (CS)).

Id. at 1263. No guidance was given as to the "price out all CLINs" phrase in Section L, id. at 1281, but the Agency reiterated, as it had elsewhere in the RFP, that CLINs 0001-0003 addressed "the efforts required in the assumption of full responsibility of the DSIAC, HDIAC, and CSIAC BCO requirements," id. at 1263. This answer neither confirms QSI's view of the transition period requirement nor refines the guidance in the RFP as to the appropriate allocation of costs to CLINs 0001-0003.

The second question also sought clarity regarding the cost allocation to CLINs 0001-0004:

> Q: Since the Transition CLINs ((0001 (DS[IAC]), 0002 (HD[IAC]), 0003 (CS[IAC])) and the Operation CLIN (0004) overlap, do the instructions mean that only costs associated with transition (e.g., cost associated with mobilizing, training, and otherwise preparing to assume complete responsibility of an IAC) are to be priced in a transition CLIN and that **any** costs associated with IAC operations that are assumed or ongoing during the 90-day transition period are to be priced to the Basic Center Operations (BCO) CLIN (0004)?
>
> A: The transition CLINS refer to the 90 day transition-in period for DS[IAC], CS[IAC], and HD[IAC] to include the costs associated with transition and ramping up services to full operational capability. Please see Section F, Deliveries Performance.

Id. at 1264. Here again, the Agency did not fix a firm boundary between the costs that should be allocated to CLINs 0001-0003 and CLIN 0004, as requested, but restated the guidance that CLINs 0001-0003 "include the costs associated with transition and ramping up services to full operational capability." Id. This answer, too, provides no confirmation of any Agency intention that contract performance costs of IAC services during the ninety-day transition period should be included in CLINs 0001-0003 of the successor contract.

Finally, the Agency once more resisted an attempt to firmly establish a boundary between the costs of preparation for IAC contract performance as contrasted with IAC contract performance costs during the transition periods. The third question offered a rewrite of RFP L5.2:

> Q: Is this an accurate interpretation of paragraph L5.2? "Phase-In Transition (CLIN 0001 (DS[IAC]), CLIN 0002 (HD[IAC]), CLIN 0003 (CS[IAC])). The Offeror shall propose Cost Plus Fixed-Fee (CPFF) amounts for the efforts

> required in the assumption of full responsibility of the DSIAC, HDIAC, and CSIAC BCO requirements. If an Offeror proposes no need to transition from another contractor or a shorter than 90 day transition period, the Offeror shall still price out all **transition** CLINs **(0001, 0002, 0003)** based on their proposed cost to perform the initial 90 days of **transition** services after contract award. **The Offeror shall price all BCO services (non-transition services) assumed or on-going during the initial 90 day period to the BCO CLIN (0004).** The offeror's approach to providing services during the initial 90 day period shall be addressed in Technical Capability Volume II."

Id. (bold text indicates the offeror's additions to RFP L5.2, underlined text indicates the offeror's suggested deletion from RFP L5.2). The Agency did not rewrite the provision, however, and instead provided this answer:

> A: As indicated in Section L5.2, the Offeror shall still price out all CLINs based on their proposed cost to perform the initial 90 days of services after contract award. It is a business decision to be made by the offeror as to how they will fulfill the 90 day transition period requirement.

Id.

Reading the RFP as a whole, as the court must, it is clear that the Agency refused to firmly define the scope of costs that could be included in CLINs 0001-0003, and gave guidance that these transition CLINs were focused on the costs of preparing to perform, not performance of, IAC services. QSI's interpretation of the RFP is not reasonable. SURVICE chose not to include performance of IAC services in its transition CLINs, and it was not required to do so by the RFP. The Agency's acceptable rating for SURVICE's technical capability subfactor 1 therefore does not violate the terms of the RFP. Because this protest ground is founded on the alleged violation of an RFP requirement that is nowhere stated in the RFP, it cannot be sustained.

### 2. Even if the RFP Could Be Considered to Be Ambiguous, Any Ambiguity Was Patent

Under binding precedent, this court cannot entertain a protest founded on the protestor's interpretation of a patent ambiguity in an RFP that the protestor should have protested before submitting its proposal. See Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000) (observing that when an RFP includes a patent ambiguity, a potential offeror has "a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation" (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996))), quoted in Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007). An ambiguity in an RFP is generally patent if offerors seek clarification of the ambiguous provision prior to submitting their proposals. See Per Aarsleff A/S v. United States, 829 F.3d 1303, 1312-13 (Fed. Cir. 2016) ("[T]he ambiguity in the solicitation was patent, as reflected in the questions received by the Air Force and the two plausible interpretations indicated above. Following clarification during the question and answer period, the ambiguity was removed, and so there was at that time neither a patent nor a latent ambiguity."). Assuming

that the RFP here contained some ambiguity regarding transition plans and costs, which is not how the court reads the RFP, see supra Section II.B.1, the ambiguity was patent because it was repeatedly questioned by potential offerors, as explained below.

First, the Agency released a draft RFP for comment on September 4, 2019. AR 184-443. Many of the terms in the draft RFP relevant to an offeror's transition plan and costs were either similar, or identical, to the same terms in the RFP issued on November 12, 2019. Both SURVICE and QSI expressed concern that it was not clear how they should allocate costs to the transition CLINs. Id. at 476 (comment 1), 480 (comment 44), 484 (comment 10). In other words, they responded to the transition-related requirements set forth in the draft RFP and sought further clarity on the topic, reflecting that they found the terms of the draft RFP unclear.

Second, potential offerors responded to the RFP with three questions that sought further clarity regarding the transition plan requirement and, specifically, the costs that should be allocated to CLINs 0001-0003. See supra Section II.B.1. That such questions were asked shows, again, that the RFP's ambiguity regarding the transition requirement, if any, was patent.

Although QSI contends that any ambiguity in the RFP as to transition costs was not apparent at the time of proposal submission, see QSI's Reply 7 ("To the extent there is any ambiguity in the terms of the RFP, that ambiguity didn't arise until the GAO protest."); id. at 10 (stating that the Agency's interpretation of the transition requirement in the RFP was "not apparent prior to submission of proposals"), that assertion is not supported by the record of this procurement, see AR 476, 480, 484, 1263-64. If the RFP was ambiguous as to transition requirements, any such ambiguity was patent.

Rather than lodging a protest of the transition provisions of the RFP, QSI submitted a proposal that expressed an assumption regarding transition requirements that the Agency had never confirmed. See id. at 1938 (QSI proposal) ("The RFP requires that operating costs be bid for any time within the first 90 days after transition is complete."), 1939 (QSI proposal) ("It should be noted that comparing our fully operational costs within the first 30 days of the contract to other offerors' transition costs for the entire transition period is not an equitable analysis."). Because any ambiguity in the RFP as to transition plans and costs was patent, QSI could not wait until after award to assert its interpretation of the transition requirement. See Stratos Mobile Networks USA, LLC, 213 F.3d at 1381 (stating that the protestor's interpretation of an ambiguous solicitation term could not be accepted because "[a] patent ambiguity . . . would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties"). As a result, to the extent that QSI's protest is founded on its interpretation of a patently ambiguous RFP term, such a challenge is barred by the patent ambiguity rule stated in Stratos Mobile Networks USA, LLC.[3]

[3] As QSI notes, the waiver rule relied upon by defendant, see Blue & Gold Fleet, L.P., 492 F.3d at 1313 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."), specifically applies to patent defects or errors336 in a solicitation, and United

### 3. A Mathematical Error in the Agency's Evaluation Does Not Invalidate the Award

Turning now to the other concern raised by QSI, the court considers whether a mathematical error in one portion of the IGCE rendered the Agency's award decision irrational and whether the error was prejudicial to QSI.

In preparing the IGCE, the Agency estimated the transition costs for the three incumbent IAC contracts, entered these values, separately, in spreadsheet cells for each of the transitions, and included these amounts in the total IGCE of $98,292,531. AR 1-4. For the DSIAC transition, which was designated in other parts of the RFP as CLIN 0001, the estimate was $240,988; for the HDIAC transition, linked to CLIN 0002 in the RFP, the estimate was $245,808; and for the CSIAC transition, linked to CLIN 0003 in the RFP, the estimate was also $245,808. Id. at 2. In a column designated "TRANSITION," the Agency also allocated some "shared services," perhaps allocable to all three transition CLINs, in the amount of $62,805. Id. Then, at the bottom of the TRANSITION column, the Agency combined the DSIAC transition costs of $240,988 with the shared transition costs of $62,805 to arrive at a total figure of $303,803. Id.

It is this figure of $303,803 that is consistently represented in the Agency's record of this procurement as the IGCE for the transition costs of the IAC BCO ID/IQ contract. See id. at 2, 3332, 3341-42, 3378-79, 3407-08, 3476, 3486. As QSI points out, however, this figure ignores the IGCE costs allocated to the HDIAC and CSIAC transitions, which were originally estimated to be $245,808 each, for a total of $491,616 in transition costs that are not represented in the $303,803 figure. There can be no doubt that the IGCE total transition costs figure should have been, by the Agency's own data and logic, closer to $795,419 than to $303,803.[4]

The overall IGCE figure $98,292,531 is not contested. Indeed, the spreadsheet indicates that the costs for the HDIAC and CSIAC transitions were included in the total IGCE figure. Id.

---

States Court of Appeals for the Federal Circuit's analysis in that decision only references the doctrine of patent ambiguity as support for the waiver rule. The effect of a patent ambiguity in a solicitation is exactly the same, however, in that the protestor, after having submitted its proposal, loses, or waives, its right to rely on its interpretation of the patently ambiguous term as a ground for overturning a contract award. See, e.g., Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 998 (Fed. Cir. 1996) ("Grumman did not seek clarification of the patently ambiguous provision or the patently ambiguous answer [provided by the agency]. This failure prohibits Grumman from now arguing that its interpretation of the provision is the correct interpretation."); Tetra Tech AMT v. United States, 128 Fed. Cl. 169, 181 (2016) ("[W]here the ambiguity is a patent one, the opportunity to challenge it is waived if the offeror fails to seek clarification from the government prior to the award.").

[4] At the GAO, the Agency contended that a more accurate total would have been $4810 less than $795,419, due to a misplaced year of performance for CLIN 0002, which would reduce this figure to $790,609. AR 5592.

at 1-2. And, throughout the proposal evaluation and award decision process, the Agency continued to use the $98,292,531 figure from its IGCE spreadsheet. Id. at 3332, 3341-42, 3379, 3476, 3508.

The AR shows that SURVICE allocated $34,094 to CLIN 0001, $113,246 to CLIN 0002, and $119,110 to CLIN 0003, for a total transition cost of $266,450. Id. at 2827, 3379. The Agency compared this figure to the incorrect IGCE transition figure, $303,803, rather than the more accurate figure of $795,419. Id. at 3379. QSI's transition cost figure of $1,154,231, which included IAC operational costs, was also compared to the erroneous IGCE figure of $303,803. Id. In QSI's view, the award to SURVICE cannot stand because the "Agency failed to perform the required cost [realism] analysis for each CLIN." QSI's Mot. 31. The court cannot agree.

The Agency did not violate the RFP in its cost/price analysis. The cost realism analysis required by the RFP was neither tied to specific elements of the IGCE nor defined as a CLIN-by-CLIN analysis. AR 1259. The IGCE was used for a price analysis of the "Offeror's prices," which does not constrain the Agency in the way QSI argues here. Id. The cost realism analysis, itself, addressed a group of eleven CLINs, and there is no mention in the RFP of a transition-specific cost realism analysis. Id. Instead, any cost realism analysis was required to examine specific cost elements of the offerors' proposals. Id. As defendant notes, specific cost elements such as levels of staffing and labor rates were examined as part of the Agency's cost analysis of both SURVICE's and QSI's proposals. Def.'s Mot. 21 n.2 (citing AR 3408-09, 3517); Def.'s Reply 10-11 (same). QSI asks the court to hold the Agency's cost analysis to a higher standard than that required by the RFP, which the court must not do. Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375-76 (Fed. Cir. 2009).

QSI also contends that the Agency's cost/price analysis of SURVICE's transition CLINs violated provisions of the Federal Acquisition Regulation ("FAR") requiring adequate award decision documentation, FAR 15.308, and effective cost realism analyses, FAR 15.404-1. The court has reviewed the relevant portions of the evaluation of SURVICE's proposal and cannot conclude that either FAR 15.308 or FAR 15.404-1 was violated. The documentation of the cost and price analyses conducted by the Agency in this procurement contains the level of detail needed under the circumstances. As for the Agency's cost realism analysis, it met the requirements of the RFP and QSI has not shown how FAR 15.404-1 imposes stricter requirements that were not met here. QSI has not met its burden to show that the Agency violated the FAR in its award to SURVICE.

Indeed, in the context of the IAC BCO ID/IQ procurement, the mathematical error in the IGCE was a minor error. The transition CLINs constituted less than one percent of the total contract costs in the IGCE, even when the $795,419 figure is used. Further, as both SURVICE and defendant note, the transition costs of an incumbent IAC contractor such as SURVICE would almost certainly be less than those of nonincumbent offerors, which mitigates the difference between SURVICE's proposed transition costs and the transition costs estimated in the IGCE. Whether SURVICE's costs are compared to $303,803, the erroneous IGCE figure, or $795,419, the more accurate IGCE figure, it is reasonable to describe SURVICE's transition costs as acceptable.

In other words, the fact that SURVICE's figure for its transition was approximately one-third of the transition costs estimated in the IGCE does not impair the rationality of the Agency's cost/price analysis or its award decision. Both QSI and SURVICE submitted proposals that were very close in total price, and the IGCE, too, was very much in line with the total price submitted by SURVICE. The decision to accept both offerors' transition plans and costs as acceptable, as reflected in the record of this procurement, appears to the court to be a fundamentally rational decision.

Lastly, QSI has not shown that it was prejudiced by the flaw in the transition costs figure used by the Agency. The same flawed figure was compared to each offeror's transition costs. The Agency did not state that it had any preference for the transition costs of SURVICE, or for those of QSI, and each offeror was rated exactly the same on its transition plan. AR 3340, 3425, 3501, 3504. Absent "disparate treatment or particularized harm," there is no prejudicial error for the court to remedy. Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1380 (Fed. Cir. 2009). The court concludes that there was no prejudice to QSI from the Agency's mathematical error and that QSI is not entitled to judgment on its motion.

## III. CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.

QSI's construction of the RFP is not supported by that document, and the alleged violations of the RFP in SURVICE's proposal, and in the Agency's evaluation of SURVICE's proposal, are not grounded in the RFP's terms. In the alternative, if the RFP's requirement regarding transition plans and costs could be considered to be ambiguous, any ambiguity was patent and QSI was obliged to protest the ambiguous term before submitting its proposal. Further, the Agency's cost/price analysis was not irrational or contrary to the requirements in the RFP or the FAR and the mathematical error in the IGCE did not prejudice QSI. Finally, because QSI has not succeeded on the merits of its protest, the court need not discuss the factors that permit this court to award injunctive relief to a protestor. See Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 999 (Fed. Cir. 2018) (stating that "proving success on the merits is a necessary element for a permanent injunction").

For these reasons, the court **DENIES** defendant's motion to dismiss as moot, **DENIES** QSI's motion for judgment on the administrative record, and **GRANTS** SURVICE's and defendant's cross-motions for judgment on the administrative record. The clerk is directed to enter judgment accordingly and dismiss the case. No costs.

The court has filed this ruling under seal. The parties shall confer to determine agreed-to proposed redactions. Then, **by no later than Wednesday, February 17, 2021**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a**

**copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

Further, the court reminds the parties of their obligation under paragraph 12 of the protective order filed on September 29, 2020, to file redacted versions of protected documents for the public record.  If the parties have not already filed redacted versions of their motions and supporting briefs, they shall file a joint status report **by no later than Wednesday, February 17, 2021**, explaining the reason for the delay.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge